This memorandum opinion was not selected for publication in the New Mexico Reports.  Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions.  Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**WILLIAM "MACK" VAUGHAN,**

    Plaintiff-Appellant,

v.                                            **NO. 30,395**

**ST. VINCENT HOSPITAL, INC.,**

    Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Barbara J. Vigil, District Judge**

Stephen Durkovich
Nikko Harada
Santa Fe, NM

Garcia & Vargas, LLC
Ray M. Vargas, II
Erin O'Connell
Santa Fe, NM

for Appellant

Hinkle, Hensley, Shanor & Martin, LLP
William P. Slattery
Dana S. Hardy
Santa Fe, NM

for Appellee

**MEMORANDUM OPINION**

**SUTIN, Judge.**

The district court entered summary judgment in favor of St. Vincent Hospital, Inc. (the Hospital) on Plaintiff William "Mack" Vaughan's complaint for medical negligence alleging "the apparent failure by [the Hospital] through an administrative inadequacy to forward [a] radiology report on to" Plaintiff's treating physician. The court entered summary judgment on the ground that Plaintiff failed to present an expert witness on the Hospital's alleged negligence and on causation and on the ground that the complaint failed to give sufficient notice of a claim against the Hospital based on apparent agency and vicarious liability. We hold that Plaintiff's complaint did not give sufficient notice of a claim of vicarious liability, and we affirm the summary judgment on that issue. We hold, too, that Plaintiff failed to establish evidence supporting a breach of duty under any standard of care. We also affirm the summary judgment on that issue. Because we affirm the summary judgment on those issues, we do not address the causation issue.

**BACKGROUND**

**Facts**

On August 8, 2002, Plaintiff went to the Hospital's emergency room because he was suffering from severe abdominal pain. Plaintiff was first treated by Dr. Martin Wilt. Plaintiff underwent a number of examinations, including an abdominal CT scan ordered by Dr. Wilt. Dr. Wilt called the on-call surgeon, Dr. Anna Voltura, to examine Plaintiff. Before she saw Plaintiff, Dr. Voltura went to the radiology department to review Plaintiff's CT scan with the radiologist, Dr. Damron. Dr. Damron and Dr. Voltura looked at the CT scan and concluded that Plaintiff had a diverticular abscess. According to Dr. Voltura, they did not discuss the possibility of the abscess being a neoplasm (cancer).

Based on what Dr. Voltura and Dr. Damron read on the CT scan, as well as the fact that Plaintiff's white blood count was elevated, Dr. Voltura told Plaintiff that he had a diverticular abscess. Dr. Voltura stated in her deposition that she attempted to persuade Plaintiff to be admitted to the hospital that night, but Plaintiff, having received IV fluids and medication, was feeling better, and did not want to be admitted. Plaintiff was discharged with antibiotics for a diverticular abscess. Dr. Voltura explained that, had Plaintiff been admitted, he would have been treated with antibiotics and a follow-up CT scan, and he would have been set up with a gastroenterologist to do a colonoscopy in the future. Dr. Voltura indicated to Plaintiff that whether he went home that night or not, he needed to follow up with her in order

3

to undergo a sigmoid colectomy (removal of the left side of the colon).  Plaintiff did not follow up with Dr. Voltura for the sigmoid colectomy.

A radiology report was apparently dictated at some point by Dr. Damron and the report was transcribed the day after Plaintiff's visit on August 9, 2002.  The transcription indicates that it is a Hospital document.  The report noted "[a]n abscess associated with a diverticulitis would be a first consideration with  neoplasm as the etiology being the second consideration."  Dr. Damron's "[impression,]" however, read only:  "Pelvic abscess, probably associated with diverticular disease of the sigmoid colon.  The abscess approximates 4.5 x 3 cm in size.  The results of this study were communicated to Dr. Wilt and Dr. Voltura."  The transcription of Dr. Damron's report does not indicate any copy was to go to Dr. Wilt or to Dr. Voltura.  In her sworn statement in the record, Dr. Voltura states that she should have received the report[1] and that if she would have seen the word "neoplasm" in the report, she would have called Dr. Damron to discuss it; had she thought it was a cancer she "would have tried to do whatever I could to get ahold of the patient."  In October 2003, Plaintiff was diagnosed with stage III colon cancer.

**District Court Proceedings**

---

[1] Dr. Voltura agreed, however, that she could not "rule out" that the report was otherwise sent to her office, but for some reason did not get filed in her office chart for Plaintiff.

4

We set out the court proceedings in detail to show the manner in which Plaintiff litigated the case in the district court. In January 2006, Plaintiff filed a "Complaint for Medical Negligence" against the Hospital. He alleged that the CT scan showed "a mass adjacent to [Plaintiff's] sigmoid colon and his bladder" and that "[t]he radiologist who read the CT scan determined that, given the mass, the diagnostic possibilities were either an abscess associated with diverticulitis or a neoplasm." He further alleged that it was not clear whether all of the diagnostic possibilities set out in the transcribed report had been communicated in the conversation that occurred when Drs. Damron and Voltura reviewed the CT scan together and discussed the diagnosis that Dr. Voltura later conveyed to Plaintiff while he was still in the emergency room. Plaintiff claimed in the complaint that, through "administrative inadequacy[,]" the Hospital failed to forward the radiology report to Dr. Voltura. He alleged that "[t]he action of [the Hospital] in not forwarding on the radiology report . . . to Dr. Voltura was negligent." And he alleged that, as a consequence of the negligence, Dr. Voltura neither worked up nor ruled out the neoplasm mentioned in the report, Dr. Voltura never told Plaintiff that the CT scan showed a mass that was potentially a neoplasm, and his neoplasm was allowed to grow, undiscovered, until July 2003, by which time the cancer had entered one of Plaintiff's lymph nodes.

The complaint did not allege negligence on the part of any physician or on the part of any particular agent or employee of the Hospital. Nor did the complaint allege "ordinary" negligence as opposed to "medical negligence" as its title claimed. In August 2006, Plaintiff filed a "First Amended Complaint for Medical Negligence" that was identical to the original complaint except for correction of a date.

The Hospital denied negligence. In its affirmative defenses, the Hospital indicated that any negligence on its part should be measured comparatively if Drs. Damron, Wilt, or Voltura were negligent. The Hospital moved for summary judgment in June 2009 and based on an affidavit of its expert, Dr. Mark Kozlowski, it contended that the Hospital complied with the applicable standard of care and that the care provided was not the cause of Plaintiff's injury. The Hospital further contended that Plaintiff's claim required expert testimony on the issues of (1) the standard of care relating to the distribution of radiology reports in an emergency department, and (2) whether the alleged delay in diagnosis caused Plaintiff's injury. The Hospital asserted that Plaintiff had not identified experts who would testify regarding the standard of care and causation.

Plaintiff filed a response in August 2009, in which Plaintiff did not controvert facts; set out his own undisputed facts and asked the court to enter summary judgment on his behalf; argued that he needed no hired expert to defeat summary judgment; and

6

provided no authority whatsoever in support of any contention or argument. The Hospital filed a supplemental memorandum in support of its summary judgment motion, again with supportive authority, responsive to Plaintiff's August 2009 response.

Apparently in anticipation of a hearing set for October 22, 2009, Plaintiff fax-filed a motion for summary judgment on October 20, 2009 and filed the identical motion again on October 21, 2009. This motion asserted, among other things, that "not communicating [a radiology report] effectively is not medical negligence, it's simple negligence" and that "[t]he failure to copy Dr. Voltura might have been the fault of [the Hospital's] transcriptionist or the failure of [the Hospital's] radiologist . . . to ask that [there] be copies in his dictation." Plaintiff argued that the failure to furnish Dr. Voltura with a copy of the report was "ordinary negligence." Once again, Plaintiff provided no authority whatsoever in support of his argument.

At the hearing on October 22, 2009, before District Judge Michael Vigil on the Hospital's motion for summary judgment, the Hospital pointed out that Plaintiff's response to the Hospital's motion for summary judgment relied on a statement of Dr. Voltura's that she would have expected Dr. Damron to call her if his impression had changed. Counsel asserted that, in almost four years that the case had been pending, there had never been a complaint allegation by Plaintiff that Dr. Damron was

7

negligent or that Dr. Damron was an agent or apparent agent or employee of the Hospital. Plaintiff then argued, based on statements in an affidavit of Dr. Donald Wolfel that Plaintiff filed on the day of the hearing, that "Dr. Damron should have copied his report and sent it on down to Dr. Voltura[,]" which was "an ordinary negligence issue." This prompted the Hospital to again point out that there existed no allegation in the complaint that Dr. Damron was negligent or that he was an agent or apparent agent or employee of the Hospital. The district court questioned Plaintiff's counsel regarding how he was to deal with this, stating "[y]our claim is against [the Hospital], but your acts of negligence seem to be [against] Dr. Damron." Plaintiff's counsel responded that Dr. Damron was an apparent agent, that the Hospital was responsible for its apparent agents, that Plaintiff was "going to have to take some discovery on it," and that Plaintiff did not have to "make the allegation" because "[t]hey're apparent agents . . . period. That's it. They just are . . . and they're aware of that."

Near the conclusion of the hearing on the Hospital's motion, the court stated that "the purpose of the pleadings is to put . . . Defendant[] on notice [of] what your theories are, and, frankly, when I read this, I have no idea [that] Dr. Damron had anything to do with the case[.]" The court then ordered the parties to file supplemental briefs on the issue of "what [has] to be alleged in a malpractice

complaint to establish . . . agency or apparent agen[cy] of Dr. Damron[.]" Seeing the court's concern, Plaintiff's counsel stated, "if it's a matter of pleading, heck, I'll amend if that's an issue." The court again asked the parties to file briefs on the issue of having to plead apparent agency and stated to Plaintiff's counsel, "then you can file a motion to amend[,]" to which Plaintiff's counsel responded, "All right." At the close of the hearing, the court asked if "the deposition of [Dr.] Damron or anybody out there" had been taken, and Plaintiff's counsel responded, "[n]o."

At no time in the October 22, 2009, hearing did Plaintiff cite any authority relating to medical or ordinary negligence. On October 29, 2009, Plaintiff filed a first amended motion for summary judgment stating little, if anything, more than he stated in his prior motion, but adding the October 22, 2009, affidavit of Dr. Wolfel. Plaintiff set out as undisputed facts the following characterizations of contents of Dr. Wolfel's affidavit.

> 7. It is the standard of care that a radiologist must communicate his diagnostic impression to the physicians known to be treating the patient. Wolfel Affidavit, ¶ 8.

> 8. This is particularly so when the diagnostic impression indicates a potentially life-threatening or urgent situation. *Id.*

> 9. The reasonable way for the radiologist to communicate his impressions of [Plaintiff's] CT was to copy his report to the consulting physicians. *Id.* ¶¶ 13, 14, 17.

9

> 10. The [Hospital's] written . . . radiology report was negligently never communicated to Dr. Voltura. *See* Voltura Statement, pp. 12-13; Wolfel Affidavit, ¶¶ 14-19.

As with his prior summary judgment motion, Plaintiff set out no authority in support of his claim of negligence.

In another supplemental memorandum filed in November 2009, the Hospital argued that the complaint failed to allege any facts or contain the elements necessary to recover under theories of apparent agency and vicarious liability, and therefore, the complaint did not provide the Hospital with notice of any such claims as required under Rule 1-008(A)(2) NMRA. The Hospital further argued that Plaintiff should not be allowed to amend his complaint to assert vicarious liability. The Hospital also filed its response to Plaintiff's motion and first amended motion for summary judgment. The Hospital argued that the motions sought relief based on vicarious liability and that Plaintiff should not be permitted to seek summary judgment on a claim he had never asserted, but that if the claim were considered by the court, disputed issues of fact precluded summary judgment.

Relying on *Houghland v. Grant*, 119 N.M. 422, 891 P.2d 563 (Ct. App. 1995), in a memorandum filed in November 2009, Plaintiff argued that New Mexico law did not require apparent agency to be pleaded, given that "a hospital is vicariously liable for the acts of hospital-based physicians[.]" He asserted that his complaint comported

with Rule 1-008(A)(2) and included apparent agency by alleging in a "short and plain statement" that because of the Hosptial's "administrative shortcomings" the radiology report did not reach Dr. Voltura. In December 2009, Plaintiff reiterated his apparent agency position and arguments in a reply to the Hospital's response to his summary judgment motions. The Hospital got in the last written word on apparent agency in its December 2009 response to Plaintiff's November 2009 memorandum.

At a hearing in February 2010 on pending matters, a newly assigned judge, District Judge Barbara Vigil, stated:

> I find the following[.] I find that to establish his malpractice claim against [the Hospital], Plaintiff has the burden of demonstrating the existence of four elements: A legal duty, breach of the applicable standard of care, and actual loss or damage, and causation. In this case, in order to establish the standard of care and causation of [Plaintiff's] injury, . . . Plaintiff[] must establish expert testimony in the area of the administrative inadequacy that [the Hospital] allegedly committed.
>
> Unfortunately, upon my review of the record thus far, . . . Plaintiff has failed to establish that expert testimony in those areas. I believe that Judge [Michael] Vigil had opened the door to allow . . . Plaintiff to come forward and determine whether [he] needed to establish more in [his] [c]omplaint by virtue of agency and vicarious liability. . . . Plaintiff[] . . . has stated, no, [I] don't need to establish vicarious liability or agency in [my c]omplaint, and that that's something that needs to be flushed out during the discovery phase of the case. But I find that [the Hospital] has made a very credible and appropriate legal argument to this [c]ourt on this issue.
>
> The idea of pleading is to give the other side notice, and I believe that . . . Plaintiff's late theory in this case that somehow Dr. Damron did something inappropriate by not sending the CT scan report to Dr.

11

Voltura is simply a moving target at this late date. I find that . . . Plaintiff[] should not be permitted, at this late date, to assert such a claim against Dr. Damron and to assert an agency theory against the [H]ospital for this alleged violation. The [Hospital] is correct that memories fade, people forget what occurred a year ago, two years ago, three years ago, and now . . . Plaintiff[] [is] asking the [c]ourt to give him an opportunity to allege this and have Dr. Damron and [the Hospital] defend this — this alleged activity six years ago. That failure of memory would work against [the Hospital] and that, in my opinion, is undue prejudice. That is not permitted under the pleading standards in New Mexico, and under the pleading standards under Rule [1-00]8 and Rule [1-00]9 [NMRA].

For this reason, I find that as pled and as discovered thus far, that . . . Plaintiff has failed to establish the minimum requirements necessary to go forward on [his] malpractice claim against [the Hospital] by failing to narrow the issue, what the facts are, and establish expert testimony to support it. For that reason, I'm granting [the] Hospital's motion for summary judgment on the — on the [c]omplaint as — as argued by [the Hospital], as presented by [the Hospital].

At the February 2010 hearing, the parties argued the issue of failure to plead apparent agency and vicarious liability, and also argued whether the Hospital was entitled to summary judgment for failure of Plaintiff to present any expert testimony on the claim of administrative inadequacy. Plaintiff's counsel noted that the report was never sent to Dr. Voltura and that "[n]o one can seem to say why." In regard to standard of care, the most Plaintiff argued was a reference to the affidavit of Dr. Wolfel who, according to counsel, "[found] a deviation from the standard of care." Nowhere in the hearing did Plaintiff argue further relating to the standard of care that was breached, nowhere did Plaintiff mention ordinary negligence, and nowhere did

12

he set out any authority to support a position that expert witness testimony was not required in whatever standard of care he sought to apply. Furthermore, the Hospital rebutted the requirement for expert testimony related to the claim of administrative inadequacy, and the court expressly found that Plaintiff failed to "narrow the issue," establish "what the facts are," establish expert testimony to support his claim, and thus "establish the standard of care" necessary to his "malpractice claim[.]" Yet, even after the hearing, Plaintiff did not seek leave to conduct further discovery or seek to clarify that his claim was not one for medical negligence or malpractice, but instead only for the ordinary negligence of the Hospital alone.

The court entered summary judgment in the Hospital's favor on the grounds that (1) Plaintiff was required to, but failed to submit, expert testimony to support the claim that the Hospital was liable in negligence in allegedly failing to have a process in place to attempt to assure that the radiology report was communicated to Dr. Voltura, and (2) Plaintiff's complaint and discovery responses did not provide notice to the Hospital, required under Rule 1-008, that he was claiming that Dr. Damron was negligent and that the Hospital was vicariously liable.

**Proceedings on Appeal**

Plaintiff asserts three points of reversible error on appeal: (1) his negligence claim against the Hospital did not require expert testimony because it was a claim of

13

ordinary, not medical negligence; (2) if expert testimony was required, the expert testimony in affidavits he provided of Drs. Wolfel and John Bagwell and in the sworn statement of Dr. Voltura provided whatever expert testimony was necessary to support his negligence claims "whether ordinary or medical as well as causation"; and (3) it was unnecessary to specifically plead apparent agency and vicarious liability in order to place the Hospital on notice of his vicarious liability claim that Dr. Damron's ordinary negligence was part of the Hospital's ordinary negligence to the extent that Dr. Damron "may have had a hand in the chain of negligence by which his report never was given to Dr. Voltura."

Following his habit in his briefs in the district court, in his brief in chief on appeal Plaintiff absolutely fails to provide any authority to support his contentions and arguments regarding the issue of expert testimony on the claim of administrative inadequacy recited in his complaint for medical negligence. Likewise, the brief in chief contains no authority for the assertion in his briefing in the district court and in the present appeal that the claim is solely one in ordinary negligence. By the filing of his reply brief on appeal, Plaintiff apparently discovered UJI 13-1119A NMRA and cases referred to in the committee commentary relating specifically to hospital negligence. In his reply brief, Plaintiff also for the first time specifically argues from two New Mexico medical malpractice cases the theory that, in some instances,

14

medical negligence can be proved without expert testimony when the malpractice is within common knowledge ordinarily possessed by an average person. *See Toppino v. Herhahn*, 100 N.M. 564, 567, 673 P.2d 1297, 1300 (1983) ("[I]f negligence [of a doctor] can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential." (internal quotation marks and citation omitted)); *Mascarenas v. Gonzales*, 83 N.M. 749, 751, 497 P.2d 751, 753 (Ct. App. 1972) ("[W]here negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort[ing] to common knowledge, expert testimony is not required.").

**DISCUSSION**

We address only Plaintiff's points relating to ordinary negligence and apparent agency/vicarious liability. The facts on these issues are not in dispute. We review summary judgments de novo when the facts are undisputed and the determination is made as a matter of law. *Moriarty Mun. Sch. Dist. Bd. of Educ. v. Thunder Mtn. Water Co.*, 2007-NMSC-031, ¶ 6, 141 N.M 824, 161 P.3d 869. "We are mindful that summary judgment is a drastic remedial tool which demands the exercise of caution in its application, and we review the record in the light most favorable to support a trial on the merits." *Woodhull v. Meinel*, 2009-NMCA-015, ¶ 7, 145 N.M. 533, 202 P.3d 126 (internal quotation marks and citation omitted). We are mindful, too, that

15

"[w]e view the facts in a light most favorable to the party opposing summary judgment[.]" *City of Rio Rancho v. Amrep Sw. Inc.*, 2011-NMSC-037, ¶ 14, __ N.M. __, 260 P.3d 414 (internal quotation marks and citation omitted). Further, we view the question of whether Plaintiff was required to provide expert testimony as a question of law which we review de novo. *See Parkhill v. Alderman-Cave Milling & Grain Co. of N.M.*, 2010-NMCA-110, ¶ 58, 149 N.M. 140, 245 P.3d 585 (stating that an issue of law is reviewed de novo), *cert. granted sub nom. Joey P. v. Alderman-Cave Milling*, 2010-NMCERT-012, 150 N.M. 493, 263 P.3d 270; *cf. State v. Torres*, 1999-NMSC-010, ¶¶ 27-28, 127 N.M. 20, 976 P.2d 20 (explaining that, although the admission of expert testimony is reviewed for an abuse of discretion, the initial determination of whether to apply the evidentiary standard for the admissibility of scientific evidence entails a conclusion of law that is subject to de novo review).

**The Complaint Was Insufficient As To Vicarious Liability**

Rule 1-008(A)(2) controls the issue of the sufficiency of the complaint as to vicarious liability. It requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Id.* Under our notice pleading standard, the complaint must be sufficiently detailed to give the defendant a fair idea of the plaintiff's claim. *Valles v. Silverman*, 2004-NMCA-019, ¶ 18, 135 N.M. 91, 84 P.3d 1056; *Wirtz v. State Educ. Ret. Bd.*, 1996-NMCA-085, ¶ 11, 122

16

N.M. 292, 923 P.2d 1177 (stating that "[t]he theory of pleadings is to give the parties fair notice of the claims and defenses against them, and the grounds upon which they are based" (internal quotation marks and citation omitted)).

Pertinent to Plaintiff's negligence claim, the complaint alleged:

6. The radiologist who read the CT scan determined that, given the mass, the diagnostic possibilities were either an abscess associated with diverticulitis or a neoplasm.

7. While the radiologist apparently called [Dr.] Voltura . . . it is not clear whether all of the diagnostic possibilities set forth in the CT scan report were communicated in that conversation.

8. Whatever was said in the conversation, the radiology report itself was apparently never sent by [the Hospital] to Dr. Voltura or to Dr. Wilt.

. . . .

13. As a consequence of the apparent failure by [the Hospital] through an administrative inadequacy to forward the radiology report on to Dr. Voltura, [Plainitff] was treated for a diverticular abscess with antibiotics, allowing the neoplasm to continue to grow.

14. The neoplasm, which turned out to be cancerous, continued to grow over the next year until approximately July of 2003 when it was discovered that it had invaded the bladder and that the colon was communicating with the bladder through a cancerous fistula.

15. By this time, the cancer was already in one of [Plaintiff's] lymph nodes.

17

> 16. The action of [the] Hospital in not forwarding . . . the radiology report of the . . . CT scan showing the potential neoplasm to Dr. Voltura was negligent.

Not until the Hospital's motion for summary judgment was filed, well over three years after Plaintiff's complaint, did Plaintiff raise the idea of amending his complaint to include apparent agency and vicarious liability. But Plaintiff never filed a motion to amend despite having discussed the possibility with the district court at the October 2009 hearing. And, while the court nevertheless ultimately denied Plaintiff's last minute request for leave to amend at the time the court entered its summary judgment in favor of the Hospital, Plaintiff has not appealed that denial and does not argue on appeal that the court erred in denying him leave to amend.

Plaintiff's argument that his complaint gave sufficient notice of the Hospital's vicarious liability for Dr. Damron's alleged negligence is based on his contention that, under *Houghland*, he does not have to allege apparent agency or vicarious liability in order to claim apparent agency and vicarious liability. We reject that argument. *Houghland* does not meet the issue or assist Plaintiff. *Houghland* stands for the proposition that a hospital is vicariously liable for the alleged malpractice committed by independent contractor physicians in the hospital's emergency room. 119 N.M. at 428, 891 P.2d at 569. But nothing in *Houghland* bears on whether a claim for relief can be pursued when the complaint is drafted without sufficient detail to give a

18

defendant, who is expressly sued for its own negligence, a fair idea of any claim of vicarious liability. Contrary to Plaintiff's argument, UJI 13-1120B NMRA, which states the elements of a hospital's vicarious liability for non-employees, does not require a different conclusion. We hold that the district court did not err in determining on summary judgment in the Hospital's favor that Plaintiff did not give sufficient notice under Rule 1-008 of assertion of a claim of apparent agency giving rise to vicarious liability.

**Plaintiff Failed to Establish Evidence Supporting Ordinary Negligence and Failed to Provide the Necessary Expert Testimony**

First, we will not consider Plaintiff's reply brief arguments based on UJI 1119A (first paragraph only) and case law. He failed to present to the district court any authority, including UJI 1119A (first paragraph) and case law, and failed to present arguments based on these authorities. Thus, the district court did not have the opportunity to consider arguments based on the authorities now appearing in Plaintiff's appellate reply brief or, for that matter, arguments based on any authority. Plaintiff failed in the same regard with respect to his brief in chief on appeal. *See* Rule 12-213(A)(4) NMRA (requiring "a statement explaining how the issue was preserved in the court below, with citations to authorities" and requiring that "[a]pplicable New Mexico decisions shall be cited"). And his arguments as to the application of rules in UJI 1119A (first paragraph) and in the cases he cites were made

19

for the first time in his reply brief on appeal. *See Kersey v. Hatch*, 2010-NMSC-020, ¶ 19, 148 N.M. 381, 237 P.3d 683 (refusing to address an argument raised for the first time in a reply brief); *J.R. Hale Contracting Co. v. Union Pac. R.R.*, 2008-NMCA-037, ¶ 64, 143 N.M. 574, 179 P.3d 579 (refusing to consider a party's reliance on a case cited for the first time in the reply brief); *Padilla v. Wall Colmonoy Corp.*, 2006-NMCA-137, ¶ 18, 140 N.M. 630, 145 P.3d 110 (declining to address a party's expansion of an argument when made for the first time in the reply brief because the party did not make the argument in the district court and also because the expanded argument was raised for the first time in the reply brief).

Presently, because none of the doctors were sued and Plaintiff cannot pursue vicarious hospital responsibility based on alleged negligence of Dr. Damron, the issue is limited to the claimed negligence liability of the Hospital based on "administrative inadequacy" in allegedly failing to assure that the transcribed report was communicated to Dr. Voltura. In summary judgment briefing, Plaintiff framed the issue this way:

> [Plaintiff's] claim against [the Hospital] arising out of the . . . facts has always been one for the administrative inadequacies of the [H]ospital. . . . [Plaintiff's] claim . . . is for [the Hospital's] <u>administrative negligence</u> in somehow not getting the radiology report from Dr. Damron, who read it, to Dr. Voltura[,] who was to treat [Plaintiff]. . . .

. . . How it is to be communicated is an administrative matter left up to the Hospital and those who are part of the Hospital's system.

The focus for this Court on this issue centers on the standard of care pertaining to any alleged communication responsibility and what was shown to be the Hospital's role and obligation, if any, in regard to the communication of the report. If the standard of care was ordinary care, no expert testimony was required. If not, expert testimony was required. The district court's judgment was based on Plaintiff's failure to present expert testimony on the question of standard of care and whether the Hospital breached a duty. In its oral determination, the district court determined that "as pled and as discovered . . . Plaintiff . . . failed to establish the minimum requirements necessary to go forward . . . by failing to narrow the issue, what the facts are, and establish expert testimony to support it."

In his complaint, Plaintiff alleged that "[t]he action of [the] Hospital in not forwarding on the radiology report . . . showing the potential neoplasm to Dr. Voltura was negligent." In his brief in chief on appeal, Plaintiff states that he sued the Hospital "for the breach of its duty to communicate a radiology report containing results from the radiologist . . . to the surgeon [the Hospital] had called in to work up [Plaintiff.]" With no reference to any facts in the record, Plaintiff makes the general and unsupported statement that, with the single exception of the radiologist who has the responsibility of dictating who is to receive a copy, a delivery system for radiology

21

reports involves only "administrative personnel" consisting of "software specialists, computer programmers, medical transcriptionists, fax operators, and couriers[,]" who are only involved in the performance of "an administrative act." He also makes the general assertion that "a system is necessary for communicating a patient's radiology results in writing from one physician to another to confirm that the results of a patient's radiology study are actually communicated to all physicians involved in a patient's radiology study [and] are actually communicated to all physicians involved in a patient's care." This assertion is not tied to anything in the record that would indicate any actual Hospital involvement, policy, practice, or system relating to communication of a radiology report to a treating physician.

Plaintiff's ordinary negligence position thus merely assumes that the Hospital had a particular policy, practice, or system, or otherwise had some obligation to communicate the report to Dr. Voltura and failed to follow a policy, practice, or system of the Hospital regarding communication. Or, the position assumes that the Hospital should have had, but had no policy, practice, or system. The gorilla in the room is that nothing in the summary judgment record reflects either the existence or non-existence of any policy, practice, or system relating to the transmission of a CT scan, done in an emergency room setting or otherwise, to physicians such as Dr. Wilt, who ordered the scan, or to Dr. Voltura, who treated a patient in the emergency room.

Furthermore, no policy, practice, or system or absence thereof relating to communication of radiology reports to treating physicians, under emergency room circumstances or otherwise, can be inferred from the general statement of Dr. Voltura that when she orders a report or is copied on one, she expects to receive it. Nor can an inference be made from Dr. Voltura's statement that having later seen her name in the body of Dr. Damron's report, she "should get it." Dr. Voltura's deposition testimony does not assist Plaintiff.

Q.      And a cc means send a — I guess, old terminology, antiquated terminology, but it means carbon copy, correct?

A.      Correct.

Q.      And it's something that we continue to use as signal to staff people to provide a copy of something to someone whose name follows the cc, even though we do it now by Xerox machine or whatever?

A.      Correct.

Q.      And really someone whose job it is to distribute things knows whether to give a copy to somebody whether there's a cc on it, right?

A.      Correct.

Q.      And it's not the person who distributes the documents who places the cc on it, right?

A.      Correct.

Q.      In fact, it would be Dr. Damron, wouldn't it?

A. Yes.

Q. In this instance with this report?

A. Yes.

Q. If he wanted a copy to go to you, he would indicate that by saying, "Copy to Dr. Voltura." If he used the shorthand, he'd say "cc Dr. Voltura"?

A. Correct.

Q. And he didn't do that, did he?

A. No.

Nothing in Dr. Voltura's testimony suggests any obligation on the part of the Hospital.

That Plaintiff resorts to assumption and speculation in regard to the Hospital is also shown in his brief in chief where, with no record support, Plaintiff states that the Hospital "apparently had such a system in place requiring their radiologist to explicitly set forth in writing their impressions and transmit them to the treating physician." He concludes, again with no basis in the record, that the Hospital "was unable to get the dictated and transcribed impressions of Dr. Damron . . . to [Dr. Voltura]." He does no more than run through "potential reasons why Dr. Voltura never got [the Hospital's t]ranscription [r]ecord[.]" Some of those potential reasons are that it was not delivered to her, whether she was copied or not, and that a "more obvious possibility is that [the Hospital] had not programmed its software or

implemented a policy or procedure mandating its transcriptionists to automatically copy any physician mentioned in the body of a [t]ranscription [r]ecord as were Drs. Wilt and Voltura in [Dr. Damron's t]ranscription [r]ecord."

Plaintiff's reliance on the affidavit of one of his experts, Dr. Wolfel, whether on the issue of medical negligence or in an attempt to establish a standard of ordinary negligence, does not bring Plaintiff any closer to a legitimate basis on which to defeat summary judgment for failure to provide expert testimony. Dr. Wolfel's affidavit stated:

> 8. It is absolutely the standard of care that a radiologist reading a diagnostic film communicate the results of his diagnostic impression to the physicians known to be managing the care of the patient, particularly so when the observed condition is considered urgent or potentially cancerous.

> 9. However, there is no medical standard for how this communication is to be accomplished.

> 10. It is simply a basic communication issue no different than any other communication issue in any other walk of life. How does a person or entity communicate important information in such a way to ensure the message gets across? The answer simply depends upon the situation.

> . . . .

> 13. The only way to ensure the entirety of the radiologist's impression is communicated in a circumstance such as that, particularly when it contains information about a potential neoplasm, is to copy the radiologist's diagnostic impressions to the consulting physicians.

25

14. This was not done with the August 9 radiology report for [Plaintiff]. It was unreasonable for the radiology report containing the information about the potential neoplasm not to have been copied to (or personally delivered) to Dr. Voltura.

15. In making this statement, I am again not stating that not copying it to Dr. Voltura was medically negligent, because there was no medical standard. It was simply unreasonable or wrong as a matter of common sense not to do so.

16. This is simply an operational or administrative matter that [a] hospital and the hospital's radiologist have to decide for themselves, knowing that the hospital and the radiologist are ultimately responsible for making sure that the entire impression to be communicated is in fact communicated.

. . . .

18. Whether the failure to copy Dr. Voltura with the radiology report was due to the negligence of [the Hospital's] transcriptionist, or whether [the Hospital's] radiologist, Dr. Damron, simply overlooked the need to get his complete report to Dr. Voltura, cannot be discerned from [Plaintiff's] records.

19. The point is that it was negligent for the [Hospital's] August 9 written radiology report not to have been conveyed to Dr Voltura on that date.

These affidavit statements are, at best, lack a factual predicate in relation to the Hospital. They are also general and vague. They are therefore inadequate to show that, in the circumstances here, the Hospital had or did not have any particular policy, practice, or system relating to communication of radiology reports generally, or relating particularly to communication of the transcribed report to Dr. Voltura, let

26

alone one that would be dictated by a duty of ordinary care. With no such evidence, no jury question existed as to the Hospital's negligence. At most, the evidence before the district court showed only that Dr. Damron had the duty to assure communication of his report to treating physicians. Furthermore, Plaintiff does not contend that the statements in Dr. Wolfel's affidavit created a genuine issue of material fact precluding summary judgment. And the district court was free to reject the statements as creating a genuine issue of material fact. Plaintiff's approach is nothing more than an unsupported assertion that the facts, as completely undeveloped as they are in regard to any Hospital policy, practice, system, or obligation, nevertheless somehow speak for themselves and thereby prove a duty. Plaintiff has never presented any authority to support such an approach.

Plaintiff essentially asks us to blanket all diverse arrangements, policies, and practices in hospitals and conclude that this and all hospitals have a duty under a standard of ordinary care to assure that all in-hospital transcribed radiology reports are communicated to treating physicians. We will not make that broad jump. And we are not going to make that jump with respect to the Hospital without evidence to support it. If such a general, blanket duty is to be established as a matter of law, we leave that policy determination to our Supreme Court or the Legislature. As to the case at hand,

the case was simply not sufficiently developed by Plaintiff for summary judgment in his favor or to prevent summary judgment in the Hospital's favor.

The district court was concerned with Plaintiff's "moving-target" approach as well as Plaintiff's failure of evidence. Plaintiff started with a complaint and amended complaint asserting a claim of medical negligence involving administrative inadequacy. He shifted to vicarious liability based on medical negligence. He shifted again to vicarious liability based on ordinary negligence. And he attempted to have his direct liability claim in medical negligence based on administrative inadequacy construed as a direct claim in ordinary negligence based on administrative inadequacy. The district court construed Plaintiff's direct liability claim as requiring expert testimony on the standard of care and its breach, and implicitly, if not explicitly, determined that Plaintiff did not establish facts to prove otherwise. Without those facts, the court did not err on the record presented in holding that Plaintiff was required to present expert testimony.

Plaintiff failed to present undisputed detailed facts in regard to any policy, practice, system, or obligation of the Hospital, in particular, or for that matter, of any duty, policy, practice, system, or obligation of hospitals generally. He did not take depositions of Dr. Damron, Dr. Wilt, the transcriptionist, or the Hospital's administrator. He sought summary judgment and defended against summary

judgment based upon supposition. He asserts application of the standard of ordinary care and also a breach by the Hospital of the standard of ordinary care based solely on the bare fact that the transcribed radiology report was not communicated to Dr. Voltura. He assumes that no other circumstances need be considered. Under that approach, the circumstances of a particular policy, practice, system, or obligation of assuring that communication occurs are irrelevant on the question of ordinary care.

Under Plaintiff's ordinary-care approach, any evidence of policies and practices or understandings among physicians or between physicians and hospitals in hospital settings and of specialized knowledge or skill that might be associated with the circumstances is unnecessary. This includes as unnecessary, for example, and without limitation, any consideration of circumstances that (1) Dr. Damron had a duty to assure that his reading of the CT scan was communicated; (2) Dr. Damron's dictated report apparently failed to correctly indicate required recipients; (3) the radiologist and treating physician actually reviewed the CT scan together and discussed it and the dictated report stated that the results had been communicated to Drs. Wilt and Voltura; (4) Dr. Voltura presumably saw no suspected neoplasm when viewing the CT scan; and (5) in the emergency room setting, Plaintiff chose not to be admitted to the Hospital notwithstanding that Dr. Voltura recommended that he be admitted. Plaintiff ignores these circumstances or other possible material circumstances that could have

29

been discovered, and Plaintiff failed to present any factual basis as to whether the average person would ordinarily possess common knowledge regarding the administrative operations and procedures "ordinarily used in reasonably well-operated hospitals under similar circumstances, giving due consideration to the locality involved." UJI 1119A (second paragraph).

Dr. Wolfel's affidavit was insufficient to constitute expert testimony on a standard of care in medical negligence. It stated that no medical standard existed covering the communication issue. The affidavit otherwise lacked any factual basis for its conclusory and unclear attempt to set a different standard of care or no standard of care.

In sum, we hold that the district court did not err in granting summary judgment in favor of the Hospital.

**CONCLUSION**

We affirm.

**IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY Judge**

30

_____
**J. MILES HANISEE, Judge**